IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT D. KLAPP, | ) | CASE NO.  5:20-CV-02850-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY | ) | JONATHAN D. GREENBERG |
| ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Robert Klapp ("Plaintiff" or "Klapp"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

## I.    PROCEDURAL HISTORY

In January 2019, Klapp filed an application for POD and DIB, alleging a disability onset date of September 18, 2018 and claiming he was disabled due to anxiety disorder.  (Transcript ("Tr.") at 15, 87-88, 107.)  The application was denied initially and upon reconsideration, and Klapp requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 15.)

On March 18, 2020, an ALJ held a hearing, during which Klapp, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On April 9, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 15-42.)  The ALJ' s decision became final on October 29, 2020, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On December 29, 2020, Klapp filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 17-18.)  Klapp asserts the following assignments of error:

> (1)  The appointment of Andrew Saul as Commissioner of the Social Security Administration violated the separation of powers.  As such, the decision in this case by an ALJ who derived his authority from Andrew Saul was constitutionally defective.

> (2)  The ALJ committed harmful error forming the RFC when he failed to properly evaluate the evidence documenting Klapp's severe impairments and failed to find the opinions of the treating sources persuasive.

> (3)  The ALJ committed harmful error when he failed to include Klapp's symptoms in the RFC and in his determination regarding Klapp's credibility in violation of Social Security Ruling 16-3p.

2

(Doc. No. 13 at 1.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Klapp was born in April 1969 and was 50 years-old at the time of his administrative hearing (Tr. 15, 41), making him a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. § 404.1563(d).  He has at least a high school education and is able to communicate in English. (Tr. 41.)  He has past relevant work as an industrial spray painter and auto-body painter.  (*Id.* at 40.)

### B.    Relevant Medical Evidence[2]

On September 18, 2018, Klapp presented to the emergency room with complaints of dizziness, lightheadedness, and chest pain with deep breaths.  (Tr. 263.)  His symptoms began while at work that day; he was a painter, and he wore a Tyvek suit and mask while working.  (*Id.*)  Klapp also reported difficulty taking deep breaths at times.  (*Id.*)  Once he took his mask off and drank some water he felt better, but once he started painting again, his symptoms returned.  (*Id.* at 264.)  Klapp was concerned that he may have lung disease from his long-term exposure to paint chemicals and wanted to be evaluated. (*Id.*)  On examination, treatment providers found no respiratory distress, no murmur or rub, non-tender back, no calf tenderness, no edema, and normal strength and sensation.  (*Id.*)  Treatment providers noted a normal EKG and troponin, although lab work revealed mild leukocytosis and mildly elevated creatinine

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

levels.  (*Id.* at 267.)  A chest CT was normal.  (*Id.*)  Treatment providers did not suspect acute coronary syndrome.  (*Id.*)  Klapp thought he most likely became overheated from his suit and not drinking enough water.  (*Id.*)

On September 24, 2018, Klapp saw Steven Wilkins, APRN, CNP, for follow up after his emergency room visit.  (*Id.* at 327.)  Klapp reported continued shortness of breath and chest pain with activity, as well as constant pressure in his chest.  (*Id.*)  Wilkins noted Klapp's cardiac and pulmonary work up at the emergency department were negative.  (*Id.*)  Klapp denied depression, hallucinations, memory loss, substance abuse, suicidal ideas, nervousness, anxiety, and insomnia.  (*Id.* at 328.)  On examination, Wilkins found normal heart rate and rhythm, normal heart sounds, no gallop or friction rub, no murmur, normal breathing effort, normal breath sounds, no respiratory distress, no wheezes, no rales, no tenderness, normal range of motion, no edema, tenderness, or deformity, no cervical adenopathy, and normal mood, memory, affect, and judgment.  (*Id.* at 329.)  Wilkins ordered an EKG and stress test, and prescribed albuterol for Klapp's shortness of breath.  (*Id.*)

On October 11, 2018, Klapp underwent a stress test that was determined to be inconclusive because of the heart rate attained.  (*Id.* at 290.)  While Klapp denied chest symptoms during the test, he "became severely SOB at peak, dizzy/lightheaded, and requested to stop."  (*Id.*)

On January 7, 2019, Klapp saw Wilkins for follow up regarding his continued breathing problems.  (*Id.* at 335.)  Klapp also reported continued chest pain, "but only when he stresses out."  (*Id.*)  Klapp told Wilkins he had "another incident" while at work where he almost passed out.  (*Id.*)  Wilkins noted Klapp's

4

cardiac work up was negative, and his pulmonary work up showed "questionable COPD," as the respiratory therapist was unable to get a quality test.  (*Id.*)  Wilkins wrote:

> Essentially, he has had an extensive workup and we have not found anything to explain his chest pressure and dyspnea.  At this time, I feel anxiety is the most likely etiology.  He has been out of work for more than 2 months, and he states when the bills come he has worsening of symptoms.  I did prescribe him Ativan for panic attacks.  He has taken these a few times, feels it does not relieve the symptoms, but does stop them from progressing.

(*Id.*)  Klapp was open to taking daily medication at that time.  (*Id.*)  Klapp endorsed nervousness, anxiety, and insomnia.  (*Id.* at 336.)  On examination, Wilkins found normal heart rate and rhythm, normal heart sounds, no gallop or friction rub, no murmur, normal breathing effort, normal breath sounds, no respiratory distress, no wheezes, no rales, no tenderness, normal range of motion, no edema, tenderness, or deformity, no cervical adenopathy, and normal mood, memory, affect, and judgment.  (*Id.* at 337.)  Wilkins diagnosed Klapp with generalized anxiety disorder and prescribed Zoloft.  (*Id.* at 337-38.)

On January 8, 2019, Klapp saw Vimala Rapaka, M.D., for follow up regarding his shortness of breath on exertion.  (*Id.* at 357.)  Klapp denied chest tightness of shortness of breath at rest, but reported he continued to have shortness of breath on exertion going up and down the stairs and showering.  (*Id.*)  Klapp told Dr. Rapaka he felt short of breath before seeing his primary care physician the day before, and before coming in for his appointment with Dr. Rapaka.  (*Id.*)  Klapp reported his primary care physician told him his symptoms were secondary to anxiety, and Klapp himself thought he had anxiety problems.  (*Id.* at 358.)  On examination, Dr. Rapaka found lungs clear to auscultation, no wheezing or rhonchi, no

5

heart murmur, gallops, or rubs, normal extremities, normal gait, normal reflexes, and grossly intact sensation.  (*Id.* at 359.)  Klapp reported his shortness of breath was better than before and that he thought his shortness of breath was secondary to anxiety.  (*Id.* at 360.)  Klapp's diagnoses included COPD, but as Dr. Rapaka noted, "per the respiratory therapist [Klapp] had real difficulty in understanding to do the test and the test results with [sic] not accurate."  (*Id.*)  Dr. Rapaka ordered repeat spirometry that day since Klapp was less symptomatic, and the results were normal.  (*Id.* at 360, 365.)

On February 1, 2019, Klapp filled out an Adult Function Report stating he was always short of breath.  (*Id.* at 219.)  He got "very out of breath" while showering and needed to rest halfway through but had no other problems with his personal care other than needing to set alarms on his phone to remind him to take his medication.  (*Id.* at 220-21.)  He mowed the lawn using a riding mower, which took about an hour once a week.  (*Id.* at 221.)  He went out very rarely and noted it was harder to breathe in the cold.  (*Id.* at 222.)  He could drive and go out alone.  (*Id.*)  He did not shop because of all the walking and he would have to take breaks.  (*Id.*)  He could pay bills and count change.  (*Id.*)  He noted lifting, squatting, bending, and climbing the stairs were too strenuous and it took him a while to catch his breath afterwards.  (*Id.* at 224.)  He needed frequent breaks when walking.  (*Id.*)  He had trouble concentrating.  (*Id.*)  He could walk for about 50 yards before he needed to stop and rest for five to ten minutes before continuing walking.  (*Id.*)  He could pay attention for about 10-15 minutes.  (*Id.*)  He had no problem following written and spoken instructions, getting along with authority figures, and handling changes in routine, although he did not handle stress well.  (*Id.* at 224-25.)  He had never been fired from a job.  (*Id.* at 225.)

His anxiety caused shortness of breath "all the time," as well as chest tightness and panic attacks.  (*Id.* at 226.)

On February 7, 2019, Klapp saw Wilkins for follow up.  (*Id.* at 342.)  Klapp reported worsening restless leg syndrome and incontinence since starting Zoloft, and that Zoloft did not seem to be effective at the current dosage.  (*Id.*)  Wilkins noted, "I have always felt anxiety was the source of symptoms, but he disagreed at first.  I started him on Zoloft and Ativan for panic attacks.  This has reduced the frequency and intensity of episodes, but he still has intermittent dyspnea."  (*Id.*)  Wilkins increased Klapp's Zoloft and started him on medication for his restless leg syndrome and incontinence.  (*Id.* at 344.)

On February 13, 2019, Klapp went to the emergency room for chest pain after sneezing.  (*Id.* at 734.)  Michael Kelley, M.D., noted Klapp's recent negative stress test and lack of exertional symptoms, normal EKG, and unremarkable cardiac workup.  (*Id.*)  Dr. Kelly felt Klapp's symptoms were "more an inflammatory process" as opposed to "an acute cardiac cause."  (*Id.*)

On March 29, 2019, Klapp underwent a psychological consultative examination with Bryan Krabbe, Psy.D.  (*Id.* at 376-82.)  Klapp described his disability as consisting of difficulty breathing, shortness of breath, and anxiety.  (*Id.* at 377.)  Klapp reported difficulties staying focused and performing tasks in a timely manner during his work history.  (*Id.* at 378.)  He got along well with supervisors and coworkers, although he would "'call off a lot'" as he struggled to manage stress at work.  (*Id.*)  Klapp reported getting sad a lot, as well as bored, and he endorsed depression symptoms including poor mood, feeling worthless, low energy, insomnia, decreased motivation, concentration problems, and social

7

withdrawal.  (*Id.*)  Klapp also endorsed anxiety symptoms, including restlessness, being easily fatigued, difficulty concentrating, irritability, muscle tension, and sleep disturbance.  (*Id.*)  In terms of activities of daily living, Klapp reported difficulty sleeping, going to bed at 12 a.m. and waking up at 6 a.m.  (*Id.* at 379.)  He spent his time watching TV, riding his motorcycle, and walking outside.  (*Id.*)  Klapp could take care of his own hygiene, perform household chores, grocery shop, and prepare basic meals, although he often had low motivation.  (*Id.*)  Klapp reported trouble remembering appointments and medication, and he had minimal social contact outside of his family.  (*Id.*)  Klapp was able to drive.  (*Id.*)

On examination, Dr. Krabbe found adequate grooming and hygiene, adequate energy, good effort completing tasks, normal speech, nervous mood and affect, and signs of anxiety.  (*Id.*)  Klapp appeared to have sufficient judgment and adequate insight.  (*Id.* at 380.)  Dr. Krabbe determined Klapp's performance completing cognitive tasks revealed adequate remote recall, below average short-term memory, below average attention and concentration, and average range of intellectual functioning.  (*Id.*)  Dr. Krabbe noted Klapp did not report any significant problems learning work-related tasks.  (*Id.* at 381.)  Dr. Krabbe diagnosed Klapp with unspecified depressive disorder and unspecified anxiety disorder.  (*Id.*)  Dr. Krabbe opined Klapp described depression and anxiety symptoms "that could result in increased worry and a corresponding decrease in attention and concentration," and he described a history of attention and concentration problems in work environments, "including difficulty completing tasks in a timely and effective manner."  (*Id.*)    Dr. Krabbe further opined Klapp functioned within adequate limits "to understand and respond to supervisor feedback and adequately relate to co-workers."  (*Id.*)  Finally, Dr.

8

Krabbe opined Klapp described depression symptoms "that may compromise his ability to respond to work pressures leading to increased emotional instability and withdraw [sic]," as well as anxiety symptoms "that may compromise his ability to respond to work pressures leading to increased likelihood of agitation." (*Id.* at 382.)

On April 10, 2019, Klapp saw Dr. Rapaka for follow up regarding his shortness of breath and chronic cough. (*Id.* at 533.) Klapp reported he felt a little better after starting his antianxiety medication, but he recently got an upper respiratory infection/cold and felt worse again. (*Id.*) On examination, Dr. Rapaka found lungs clear to auscultation, no wheezing or rhonchi, no heart murmur, gallops, or rubs, normal extremities, normal gait, normal reflexes, and grossly intact sensation. (*Id.* at 535.) Dr. Rapaka noted, "Patient is very symptomatic and his symptoms are suggestive of possible underlying COPD. Even though the PFTs are within normal limits would give a trial of Spiriva 1 capsule inhalation daily." (*Id.* at 536.)

On April 18, 2019, Klapp saw Wilkins and requested a psychiatric referral. (*Id.* at 511.) Klapp reported Zoloft and Ativan were not helping. (*Id.*) Klapp told Wilkins he had additional stressors of being denied disability and his father, who had terminal colon cancer, was not doing well. (*Id.*) Klapp endorsed nervousness and anxiety but denied insomnia. (*Id.* at 512.) On examination, Wilkins found normal heart rate and rhythm, normal heart sounds, no gallop or friction rub, no murmur, normal breathing effort, normal breath sounds, no respiratory distress, and normal mood, memory, affect, and judgment. (*Id.* at 513-14.)

9

On April 30, 2019, Klapp met with Crystal Mann, LPC, RN, for an adult diagnostic assessment. (Tr. 400-420.)  Klapp reported his primary care physician had referred him for anxiety and had ruled out physical causes for Klapp's breathing issues and chest tightness.  (*Id.* at 400.)  Klapp reported feeling sad every day and hating people.  (*Id.* at 401.)  Thinking of things caused anxiety, and Klapp got stabbing chest pain and tightness and felt like he could not breathe.  (*Id.*)  Showering, walking up and down stairs, and wearing a face mask caused shortness of breath.  (*Id.*)  Klapp reported his doctor called him off work in September 2018 because of his "severe anxiety."  (*Id.*)  Klapp told Mann he was easily irritable and had trouble letting things go.  (*Id.*)  Klapp described himself as a "high energy person" and he could have hours or days of elevated mood and energy with little appetite and an inability to sleep.  (*Id.* at 402.) Klapp reported difficulty sleeping.  (*Id.*)  Klapp denied experiencing physical pain on a regular basis.  (*Id.* at 405.)  Klapp reported he wanted to get back to work.  (*Id.* at 417.)

On examination, Mann found Klapp well-groomed with intense eye contact, agitated activity level, severely tangential thought process, anxious, euthymic mood, full affect, cooperative, hyperactive, and restless behavior, and impaired memory and attention/concentration.  (*Id.* at 407.)  Mann noted, "Cl was very tangential inm [sic] session and difficult to interject and redirect.  Cl spoke rapidly and was very animated and full of energy. Cl displayed high anxiety and reactivity."  (*Id.*)  Mann further noted Klapp struggled to sit still.  (*Id.*)  Mann diagnosed Klapp with bipolar disorder, moderate, with anxious distress (severe) and mixed features, as well as post-traumatic stress disorder with dissociative symptoms and delayed expression.  (*Id.* at 418.)

10

Klapp continued counseling with Mann throughout 2019. (*Id.* at 578-680.) Mann repeatedly found a depressed mood and nihilistic and disagreeable thought process/orientation, although Klapp's symptoms waxed and waned during this time. (*Id.*)

On June 20, 2019, Klapp saw Dr. Rapaka for follow up regarding his shortness of breath. (*Id.* at 527.) Klapp reported he continued to feel very short of breath with even minimal exertion. (*Id.*) Klapp told Dr. Rapaka Spiriva did not help much and he did not want to use the inhaler anymore. (*Id.*) Klapp reported he recently went on a cruise for vacation and while going up the stairs he began to have pain in his left hand that went up to his left chin and ear. (*Id.*) Klapp also complained of intermittent chest tightness. (*Id.*) Dr. Rapaka noted Klapp had a history of severe anxiety and panic attacks, as well as bipolar disorder. (*Id.*) On examination, Dr. Rapaka found lungs clear to auscultation, no wheezes or rhonchi, no heart murmur, gallop, or rubs, no ectopy, normal extremities, normal gait, and normal reflexes. (*Id.* at 529.) Dr. Rapaka referred Klapp to cardiology for further evaluation of Klapp's "shooting" left arm pain. (*Id.* at 530.) Under COPD, Dr. Rapaka noted, "Symptoms are suggestive of COPD PFTs are within normal limits. Patient refuses to use any inhalers. Will give when necessary albuterol." (*Id.*)

X-rays of the spine taken on June 26, 2019 revealed mild degenerative changes and a mild degree of dextro positioning of the thoracic/upper lumbar spine. (*Id.* at 480-82.)

On July 22, 2019, Klapp began receiving chiropractic treatment for his midback pain, low back pain, right thigh pain, and right forearm pain. (*Id.* at 540.) Klapp rated his midback pain as a 7/10, his

11

low back pain as a 9/10, his right thigh pain as an 8/10, and his right forearm pain as an 8/10.  (*Id.*)  On examination, treatment providers found painful range of motion of the lumbar spine, positive Kemps, negative straight leg raise, and tightness in the paraspinal muscles.  (*Id.*)  By September 9, 2019, Klapp's right thigh pain and right forearm pain had resolved, and he rated his midback pain as a 4/10 and his low back pain as a 5/10.  (*Id.* at 558.)  On examination, treatment providers found Klapp's painful range of motion of the lumbar spine had decreased since his last visit, as had his paraspinal muscle tightness.  (*Id.*)  Klapp reported he was starting to feel better again.  (*Id.*)

On July 24, 2019, Klapp began physical therapy for his low back and left knee pain.  (*Id.* at 782.)  Klapp reported pain with kneeling, sitting, standing, and walking.  (*Id.*)  Klapp reported lifting a box of shingles with someone else the day before and he hurt his back; he felt a spasm while lifting.  (*Id.* at 783.)  Klapp also had crashed his motorcycle and hurt his left knee, although he reported he only had pain when he put his left knee on the ground.  (*Id.*)  Klapp also complained of intermittent right thigh numbness.  (*Id.*)  Klapp reported his hobbies included jogging and hiking, although he had not done this since his knee started hurting, and difficulty climbing stairs because of breathing.  (*Id.*)  Stephanie Hasapis-Williamson, PT, found moderate limitation of lumbar flexion and extension, minimal limitation of lumbar glide and rotation, normal range of motion of the lower extremities, and antalgic gait.  (*Id.* at 784.)  On August 9, 2019, Klapp reported he had been doing well with his home exercise program until he was lifting some shingles and felt immediate pain in his back.  (*Id.* at 786.)  Later that week, Klapp had been helping a friend and stood on a cement block which began to sink into the ground and caused Klapp to fall, scraping

12

up his leg and twisting his back again.  (*Id.*)  Hasapis-Williamson noted increased back and left-sided thoracic pain during therapy.  (*Id.*)

On August 12, 2019, Klapp saw Leigh Ann Gratz, CNP, with a complaint of back pain.  (*Id.* at 560.)  Klapp reported he had pulled his back two weeks ago while lifting heavy objects, and then the Thursday before he had stepped in a large hole while moving an object and his back hurt worse.  (*Id.*)  Klapp told Gratz he had been taking acetaminophen or ibuprofen, which were not helping, and he had been using a heating pad.  (*Id.*)  His pain had not improved or gotten worse.  (*Id.*)  Klapp reported his back hurt from his shoulder blades to his lower back, and he had some radiation into his right thigh.  (*Id.*)  On examination, Gratz found normal extremities, decreased range of motion, tenderness, pain, and spasm of the thoracic back, and normal gait.  (*Id.* at 563.)  Gratz diagnosed Klapp with acute midline low back pain with right-sided sciatica.  (*Id.*)

On August 16, 2019, Klapp saw Mann for therapy.  (*Id.* at 596.)  Mann again noted a depressed mood/affect and nihilistic, disagreeable thought process/orientation.  (*Id.*)  However, Mann noted:

> Cl came to session in a calm mood and shared pride at being able to run daily this week and pushing himself to do more.  Cl shared feeling confident in breathing improving some, but strong sense of wellbeing due to activity.  Cl processed desire to do comedy again and not knowing how to move forward w it.  Cl processed feeling he wasted talent for comedy and how it could of [sic] been a calling.  Cl was willing to go to open mic night.

(*Id.* at 597.)

13

On August 20, 2019, Klapp saw Hasapis-Williamson for physical therapy and demonstrated poor understanding of repeated extension and had been adding sustained lumbar flexion to his daily routine, although he demonstrated increased independence with his home exercise program, increased range of motion, and decreased pain intensity.  (*Id.* at 793.)  Klapp reported he was 20% better with physical therapy and reported less pain under his shoulder blades and in his low back.  (*Id.* at 794.)  Klapp told Hasapis-Williamson sitting in certain chairs, walking for a mile, jogging, and sleeping made his pain worse.  (*Id.*)  Hasapis-Williamson found moderate limitation with lumbar flexion, minimal limitation with lumbar extension, normal lumbar glide, minimal limitation in lumbar rotation, and 5/5 lower extremity strength bilaterally.  (*Id.* at 794-95.)  Hasapis-Williamson noted reduced antalgia with gait.  (*Id.* at 795.) By August 27, 2019, Klapp reported to Hasapis-Williamson that he was feeling better, his back was less painful, and this was the best he had felt in a long time.  (*Id.* at 797.)

On August 27, 2019, Klapp saw Fernando Munoz, M.D., on referral by Dr. Rapaka.  (*Id.* at 702.) Klapp complained of shortness of breath that had worsened over the past few months.  (*Id.*)  Klapp reported mild obstructive lung disease and complained of "intermittent precordial chest pain" that was sharp in nature and not clearly related to exertion.  (*Id.*)  Klapp's biggest complaint was shortness of breath with mild to moderate exertion, such as going up and down stairs or showering.  (*Id.*)  Dr. Munoz also noted a history of panic disorders and suspected PTSD.  (*Id.*)  On examination, Dr. Munoz found lungs clear to auscultation, no wheezing or rhonchi, regular heart rhythm, no heaves, rub, or murmur, normal extremities, and coordinated gait.  (*Id.* at 705.)  Dr. Munoz ordered a repeat stress test, but this

14

time it would be a pharmacologic nuclear stress test. (*Id.*) Dr. Munoz diagnosed Klapp with dyspnea on exertion and precordial pain. (*Id.*)

On October 2, 2019, Klapp underwent a nuclear stress test, which was normal. (*Id.* at 743.)

On October 31, 2019, Klapp saw CNP Wilkins with complaints of left-hand pain. (*Id.* at 565.) Klapp reported his left ring finger began to swell two months ago and he was still having tenderness in that finger. (*Id.*) In addition, his left pointer finger recently began to swell and feel tender to the touch as well. (*Id.*) Klapp told Wilkins he could "barely make a fist." (*Id.*) On examination, Wilkins found decreased range of motion of the left hand and decreased grip strength in the left hand compared to the right. (*Id.* at 568.) Wilkins referred Klapp to orthopedic surgery for a consult. (*Id.*)

On November 5, 2019, Hasapis-Williamson discharged Klapp from physical therapy after he failed to return for follow up care as planned after September 10, 2019. (*Id.* at 803.)

On November 6, 2019, Klapp saw William Lanziger, M.D., for trigger finger in his left index and ring fingers. (*Id.* at 715.) Klapp described the pain as intermittent and moderate, and it moderately impacted his daily activities. (*Id.*) On examination, Dr. Lanziger found full range of motion of the hand with no atrophy, triggering with flexion and extension, hypertrophy of the A1 pulley, and tenderness to palpation. (*Id.* at 717-718.) Dr. Lanziger administered steroid injections to the left index and ring fingers. (*Id.* at 718.)

On December 18, 2019, Klapp saw CNP Wilkins to discuss having his disability paperwork filled out because of his left-hand pain and breathing issues. (*Id.* at 570.) Wilkins noted Klapp had had multiple

15

work ups, and nothing had really showed up to explain his shortness of breath.  (*Id.*)  While Wilkins' working diagnosis was anxiety, "there was some restrictive lung disease found on PFT."  (*Id.*)  Klapp reported he could not paint anymore as he could not breathe in his mask, and Klapp felt he could not work at all because of his hand and back pain.  (*Id.*)  Klapp told Wilkins he had been in the ER a few times recently for chest pain and shortness of breath, but cardiac work ups were negative.  (*Id.*)  On examination, Wilkins found normal heart rate, regular rhythm, normal heart sounds, no gallop, friction rub, or murmur, normal breathing effort and breath sounds, no stridor, no respiratory distress, no wheezes or rales, no tenderness, and normal range of motion.  (*Id.* at 572.)  Wilkins ordered a functional capacity exam and noted he would work on disability paperwork once it was completed.  (*Id.* at 573.)  Wilkins also recommended Klapp follow up with Dr. Lanzinger regarding his hand pain.  (*Id.*)

Klapp continued counseling with Mann throughout 2020.  (*Id.* at 681-701.)  Mann repeatedly found a depressed mood and nihilistic thought process/orientation, although in January 2020 she noted that Klapp was more open to insights.  (*Id.*)  Klapp's symptoms waxed and waned during this time.  (*Id.*)

On January 9, 2020, Mann completed a checkbox Mental Medical Source Assessment.  (*Id.* at 810-12.)  Mann opined Klapp would not be able to perform the designated task or function on a regular, reliable, and sustained schedule in the following areas: maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and/or be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and

16

length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation.  (*Id.*)  Mann further opined Klapp would be able to perform the designated task or function, but would have noticeable difficulty more than 20% of the workday or work week in the following areas: work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independently of others.  (*Id.*)  Mann further opined Klapp would be absent more than four days a month and off-task about 20% of the workday.  (*Id.* at 811.)  Mann further opined Klapp would need unscheduled breaks more than four times a day for 30-45 minutes each if working a full-time, low stress job.  (*Id.*)  In response to the question asking what medical findings supported her opinion, Mann wrote: "Diagnosed Posttraumatic Stress Disorder[,] Bipolar 1 Disorder[.] Significant impairment due to associated symptoms." (*Id.* at 812.)

On February 20, 2020, Klapp saw Wendy Pribanich, CNP, for follow up regarding low back pain. (*Id.* at 819.)  Klapp reported intermittent low back pain that started about a month before and that he described as stabbing and shocking and rated a 7/10.  (*Id.*)  Klapp told Pribanich his pain was not bad enough to take anything for it.  (*Id.*)  Klapp reported doing physical therapy last year and getting massages at the mall.  (*Id.*)  Although Klapp's insurance did not cover massotherapy, the massages at the mall

17

helped for some time.  (*Id.*)  On examination, Pribanich found normal range of motion and normal gait. (*Id.* at 821.)  She was unable to reproduce any pain on examination.  (*Id.*)  Pribanich diagnosed chronic midline low back pain without sciatica.  (*Id.*)

On February 24, 2020, Klapp underwent a functional capacity assessment.  (*Id.* at 829-832.) Timothy Verdouw, OTR/L, opined Klapp demonstrated the functional capacity to perform full-time work in the light category "while taking into account his need to alternate sitting and standing . . . ."  (*Id.* at 830.)  Verdouw noted Klapp lifted 21 pounds to below waist height, 11 pounds to shoulder height, carried 16 pounds, pulled 30 horizontal force pounds, and pushed 15 horizontal force pounds.  (*Id.*)  Verdouw further opined Klapp demonstrated occasional tolerance for bending, gross coordination, repetitive kneeling, sustained kneeling, simple grasping, squatting, and walking and frequent tolerance for above shoulder reach, forward reach, and fine coordination.  (*Id.*)  Klapp should avoid dynamic balance, static balance, firm grasping, ladders, and stair climbing in competitive employment.  (*Id.*)

**C.  State Agency Reports**

**1.  Mental Impairments**

On April 5, 2019, Cynthia Waggoner, Psy.D., opined Klapp had no limitation in his ability to understand, remember, or apply information, had a mild limitation in his ability to concentrate, persist, or maintain pace, and moderate limitations in his abilities to interact with others and adapt or manage oneself.  (*Id.* at 94-95.)  Because of his anxiety and depressive symptoms, Klapp was capable of occasional interaction with the general public, frequent interactions with coworkers and supervisors, and

18

should not work in a position requiring conflict resolution.  (*Id.* at 100.)  Dr. Waggoner further opined Klapp could adapt to occasional changes in his routine that did not require more than occasional independent judgment.  (*Id.* at 100-01.)

On June 26, 2019, Irma Johnston, Psy.D., affirmed Dr. Waggoner's findings.  (*Id.* at 114, 119-21.)

### 2.      Physical Impairments

On March 15, 2019, Bradley Lewis, M.D., opined that Klapp was limited to the medium level of exertion with a limitation to frequent fine manipulation due to bilateral carpal tunnel syndrome.  (Tr. 97-99.)

On June 26, 2019, on reconsideration, William Bolz, M.D., affirmed Dr. Lewis' findings.  (*Id.* at 116-18.)

### D.     Hearing Testimony

During the March 18, 2020 hearing, Klapp testified to the following:

- He lives with his wife and two children.  (*Id.* at 53.)  He has a driver's license.  (*Id.* at 54.)

- The biggest health problem that prevents him from working is his shortness of breath. (*Id.* at 59.)  His COPD will flare up if he overexerts himself, like walking or going up stairs, or if the weather is too hot or cold, or if there is dust, odors, or fumes.  (*Id.* at 60.)  He uses an albuterol rescue inhaler, but he does not use a nebulizer.  (*Id.*)  He gets chest pains a couple of times a day.  (*Id.* at 61-62.)  His shortness of breath and chest pain are separate issues, but they can occur at the same time.  (*Id.* at 62.)  He went to the emergency room a month ago for chest pains.  (*Id.*)  He also has back pain.  (*Id.*)  He gets an achy pain in his lower back that sometimes shoots down both legs.  (*Id.* at 63.)  He has back pain most of the day.  (*Id.*)  He could walk for 50-75 yards, stand for 11-12 minutes, sit for about 35 minutes, and lift 15-20 pounds.  (*Id.*

19

at 63-64.)  He has trigger finger in his left hand, which is his dominant hand.  (*Id.* at 65.)  His right hand is fine.  (*Id.*)  His fingers hurt to the touch and sometimes without touching the affected fingers he gets pain going down his fingers.  (*Id.* at 66.)  The trigger finger affects his ability to grip or hold things and he tends to drop things. (*Id.*)  He last dropped a glass about two months ago.  (*Id.*)

- His anxiety has a lot to do with his breathing issues.  (*Id.*)  He cannot concentrate, and he is depressed all the time.  (*Id.* at 67.)  He sees a counselor once a week and finds it very helpful.  (*Id.*)  He also takes Effexor for his mental health, which also helps.  (*Id.*)  A few days a week or more he feels like staying in the house, not talking to anybody, and not wanting to get of bed.  (*Id.* at 67-68.)  He usually stays in his house.  (*Id.* at 68.)  He gets along well with his wife and children, but he does not have contact with other people.  (*Id.*)  He has had two panic attacks where he went to the hospital, and he has had "mini anxiety attacks."  (*Id.*)  He is moody and irritable, he has crying spells, and every few months or so his mood is elevated, he has trouble sleeping, and he moves from one thing to another without finishing them.  (*Id.* at 69.) He only gets three to six hours of sleep a night.  (*Id.* at 70.)  His mind wanders and he cannot focus, so he rereads things, or he won't remember what he reads, and he does a lot of channel surfing.  (*Id.* at 73.)

- He stretches to help his back pain, and he gets massages at the mall which help a little bit.  (*Id.* at 64.)  He saw a chiropractor when his insurance covered it.  (*Id.*)  The chiropractic treatments helped for a little while but after half an hour the pain came back.  (*Id.*)  Massages also help for a little bit and then the pain returns.  (*Id.*)  He has had physical therapy for his back.  (*Id.*)  Again, it would help for a little while but then the pain would return.  (*Id.* at 64-65.)

- He has to stop halfway through his shower because he gets winded and gets chest pressure.  (*Id.* at 70.)  He empties the dishwasher, makes sandwiches, and mows the lawn.  (*Id.*)  He rides the lawnmower for 15-20 minutes before he gets off and takes a 10-15 minute break.  (*Id.* at 73.)  His wife does the grocery shopping.  (*Id.* at 70-71.) He visits a friend once or twice a month.  (*Id.* at 71.)  He can no longer hike or jog. (*Id.*)  He watches TV or plays board games with his family.  (*Id.*)

The VE testified Klapp had past work as an industrial spray painter and an auto body painter.  (*Id.* at 77-78.)  The ALJ then posed the following hypothetical question:

> I'd like you to consider an individual the same age, educational background, and work experience as the claimant.  I'd like you to presume the individual can perform the full range of light work subject to the following limitations.  Specifically this individual would be limited to frequent handling or fingering with the dominant left upper extremity.  The individual would be limited to occasional climbing of ramps or stairs but would never climb ladders, ropes or scaffolds, the individual would be limited to frequent stooping, kneeling, crouching or crawling, the individual would avoid concentrated exposure to extreme cold or extreme heat or to humidity or to dust, odors, fumes, or other pulmonary irritants.  The individual would be limited to the performance of simple, routine tasks and the performance of simple work related decisions and would be limited to occasional interactions with supervisors, coworkers or the general public.  The individual would tolerate few changes in a routine work setting, [sic] could such an individual perform the past work of the claimant?

(*Id.* at 78-79.)

The VE testified the hypothetical individual would not be able to perform Klapp's past work as an industrial spray painter and auto body painter.  (*Id.* at 79.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as mail clerk, office helper, and garment sorter.  (*Id.*)

The ALJ modified the hypothetical to limit the individual to occasional handling or fingering with the dominant left upper extremity.  (*Id.* at 80.)  The VE testified the jobs he had identified would remain.  (*Id.*)

Klapp's counsel asked the VE whether the light jobs would remain if the hypothetical individual was limited to occasional fingering on the non-dominant hand as well.  (*Id.* at 81.)  The VE testified the light jobs would remain.  (*Id.* at 82.)  Klapp's counsel also asked the VE whether the identified jobs could

21

be performed with a sit/stand option.  (*Id.*)  The VE testified the light jobs could not, although the sedentary jobs could.  (*Id.*)

### III.     STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 404.1520(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. § 404.1520(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 404.1520(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Klapp was insured on his alleged disability onset date, September 18, 2018, and remains insured through December 31, 2022, his date last insured ("DLI").  (Tr. 15.)  Therefore, in order to be entitled to POD and DIB, Klapp must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2. The claimant has not engaged in substantial gainful activity since September 18, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: a chronic respiratory disorder, clinically diagnosed as chronic obstructive pulmonary disease (COPD); degenerative disc disease (DDD) of the lumbar spine and thoracic spine; trigger fingers (two) of the left hand; a depressive, bipolar, or related disorder, variously diagnosed as an unspecified depressive disorder and as bipolar I disorder with anxious distress; generalized anxiety disorder (GAD); and posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except that he is further limited in the following nonexertional respects:
   - Can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs; can frequently stoop, crouch, kneel, and crawl;
   - Can frequently handle and frequently finger with the dominant left upper extremity;
   - Must avoid concentrated exposure to humidity, to extreme cold or heat, and to dust, odors, fumes, and other pulmonary irritants; and
   - Is able to perform simple, routine tasks and is able to make simple work-related decisions; can have only occasional interactions with supervisors, coworkers, and the general public; and can tolerate few changes in a routine work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April **, 1969 and was 49 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*see* SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 18, 2018 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-42.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings

25

are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a

26

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. Klapp's Constitutional Challenge

Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019, pursuant to 42 U.S.C. § 902(a).[3]  Section 902(a)(3) provides, "An individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id*.  The parties agree that that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner without cause.  (Doc. No.

---

[3] https://www.ssa.gov/history/saul.html.  Saul is no longer the Commissioner.

13 at 9-10; Doc. No. 17 at 7.) *See also Seila Law LLC v. Consumer Financial Protection Bureau*, -- U.S. --, 140 S. Ct. 2183, 2197 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect, or malfeasance") violates the separation of powers and is unconstitutional); *Collins v. Yellen*, -- U.S. --, 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional). The parties disagree as to what effect that unconstitutional removal restriction has on the ALJ's determination of Klapp's disability application. Klapp argues that he is entitled to remand for a new hearing and decision. The Commissioner disagrees, asserting that Klapp must show that the unconstitutional removal restriction caused the denial of his benefits claim and that he does not make such a showing.

In *Seila Law*, the Court found that the unconstitutional removal provision was severable from the other provisions of the relevant statute but did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the head of an agency who derived powers from a statute that included an unconstitutional removal provision. 140 S. Ct. at 2208, 2211. In *Collins*, the Court took up that discussion and provided guidance regarding the kind of compensable harm a plaintiff must show to be entitled to relief. 141 S.Ct. at 1787-1789.

### 1. *Collins v. Yellen*

*Collins* involved the Federal Housing Finance Agency ("FHFA"), an agency created by Congress tasked with regulating Fannie Mae and Freddie Mac, two of the country's leading sources of mortgage

financing.  141 S.Ct. at 1770.  Pursuant to the statute creating the FHFA, the head of the agency was a Director removable by the President "only 'for cause.'"  *Id*.  Fannie Mae and Freddie Mac shareholders challenged an agreement the FHFA had made with the United States Treasury (the "third amendment"), which channeled money from Fannie Mae and Freddie Mac to the Treasury rather than shareholders.  *Id*. They argued that the removal provision in the FHFA statute was unconstitutional because, by restricting the President's power to remove the FHFA Director, the statute the violated separation of powers.  *Id*. at 1787.  The Court agreed.  *Id*. (citing *Seila Law*, 140 S. Ct. at 2205).  But the Court did not provide the shareholders the remedy that they sought—that "the third amendment must be completely undone"—for the following reasons.

First, the shareholders had sought to undo the third amendment because it was "adopted and implemented by officers who lacked constitutional authority and that their actions were therefore void *ab initio*."  *Id*.  But the Court noted that the third amendment was adopted by the FHFA's Acting Director, whose position did not have the improper removal restriction that the Director's position had had, so the shareholders' attempt to set aside the third amendment "in its entirety" failed.  *Id*. at 1783, 1787.  Next, regarding the shareholders' argument with respect to the actions that Directors had taken to implement the third amendment, the Court reasoned,

> All the officers who headed the FHFA during the time in question were properly *appointed*.  Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result,

29

there is no reason to regard any of the actions taken by the FHFA in relation to
the third amendment as void.

*Id*. at 1787 (emphasis in original).

The Court went on to explain that an unconstitutional provision like the removal restriction could

inflict compensable harm, and gave the following examples:

> Suppose, for example, that the President had attempted to remove a Director but
> was prevented from doing so by a lower court decision holding that he did not
> have "cause" for removal. Or suppose that the President had made a public
> statement expressing displeasure with actions taken by a Director and had
> asserted that he would remove the Director if the statute did not stand in the
> way. In those situations, the statutory provision would clearly cause harm.

*Id*. at 1789.  The Court remanded the case for consideration of the shareholder's suggestion that "the

President might have replaced one of the confirmed Directors who supervised the implementation of the

third amendment, or a confirmed Director might have altered his behavior in a way that would have

benefited the shareholder."  *Id*. at 1789.

### 2. Klapp does not show compensable harm and is not entitled to a remand

Defendant asserts, and Klapp does not dispute, that the ALJ who decided his case was not

appointed by former Commissioner Saul.  Rather, the ALJ was appointed by Saul's predecessor, then-

Acting Commissioner Berryhill.  (Doc. No. 17 at 10; Doc. No. 18 at 5-6.)  And the parties do not dispute

that Berryhill's appointment as Acting Commissioner was not made pursuant to § 902(a)(3); did not

contain a "for cause" removal provision; and, thus, was not unconstitutional.  (Doc. No. 17 at 10-11; Doc.

30

No. 18 at 6.)  Accordingly, to the extent Klapp's arguments in his opening brief could be construed as requesting that his case be remanded because the appointment of the ALJ who decided his case was defective because he, in turn, was appointed by Saul, his argument fails.  *See* § 902(b), Deputy Commissioner of Social Security (no removal restrictions for Acting Commissioner); *Collins*, 141 S.Ct. at 1782 (when a statute is silent regarding the President's power to remove an agency head, the officer serves at the President's pleasure; the FHFA statute did not contain removal restrictions on an Acting Director and actions taken by the Acting Director to adopt the third amendment could not be challenged as unconstitutional).

Klapp asserts, "Based on the fact that Andrew Saul's tenure as Commissioner of SSA is unconstitutional, and he was Commissioner at the time of the ALJ decision in this matter, this matter should be remanded for a *de novo* hearing."  (Doc. No. 13 at 10.)  But the fact that the removal restriction in § 902(a)(3) is unconstitutional does not entitle Klapp to a remand for a new hearing and decision in his case.  As the Court in *Collins* found, "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. 141 S.Ct. at 1788 ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment," citing *Seila Law*, 140 S.Ct. at 2207–2211).  Here, Klapp has not provided a basis for concluding that Commissioner Saul lacked the authority to carry out the functions of the office because of the unconstitutional removal provision.

31

Klapp contends, "The ALJ in this matter decided this case based on regulations promulgated by Mr. Saul when he had no authority to issue the same.  This means that a presumptively inaccurate legal standard was utilized by the ALJ to adjudicate this claim."  (Doc. No. 13 at 10.)  Klapp does not cite what regulations Saul promulgated that the ALJ used to decide his case.  Moreover, his argument that Saul had no authority to carry out the functions of office because the removal restriction was unconstitutional was rejected by the Court in *Collins*.  141 S.Ct. at 1788.  His assertion in his reply brief that the ALJ who decided his case "was under the delegated authority of a Commissioner who had no constitutionally valid legal authority to delegate" (Doc. No. 18 at 3) fails for the same reason.

In his reply brief, Klapp asserts, "while Mr. Saul was Commissioner, Social Security modified the way in which musculoskeletal impairments are evaluated (DI 34121.013 and DI 34121.015)."  (Doc. No. 18 at 5.)  But POMS DI 34121.013 and 34121.015 became effective in April 2021 and did not impact Klapp's 2019 application or 2020 hearing and decision.  Klapp also asserts that when Saul was Commissioner, "he implemented changes in HALLEX which modified the way in which decisions were written (I-2-3-20 in effect July 17, 2019)."  (Doc. No. 18 at 4-5.)  But HALLEX 1-2-3-20, "Acknowledgment of Notice of Hearing," sets forth ways in which the Agency communicates to claimants that it received their notice of hearing forms.[4]  It does not modify the way the ALJs write their decisions.  And, in any event, Klapp does not claim that he suffered any harm as a result of his request for a hearing

---

[4]  *See* https://www.ssa.gov/OP_Home/hallex/I-02/I-2-3-20.html (last visited 1/25/2022).

and his receipt of the Agency's notice scheduling one.  Finally, Klapp argues, "In addition, Plaintiff did not receive a constitutionally valid hearing and adjudication from an ALJ, nor did he receive a constitutionally valid decision from an ALJ.  In addition, Plaintiff did not receive a constitutionally valid adjudication from the Appeals Council."  (Doc. No. 18 at 5.)  The basis for these assertions is unclear, and the Court shall not presume or speculate as to the grounds underpinning this argument.  However, to the extent Klapp is arguing that because Saul appointed ALJs when he was serving per the unconstitutional removal restriction, and therefore, the ALJ in this case served in an unconstitutional manner, as discussed above, Klapp does not dispute that the ALJ in his case was not appointed by Saul; therefore, there can be no implication on such a basis that the ALJ who decided his case served in an unconstitutional manner.  Furthermore, as the Supreme Court made clear in *Collins*:

> All the officers who headed the FHFA during the time in question were properly *appointed*.  Although the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office.  As a result, there is no reason to regard any of the actions taken by the FHFA in relation to the third amendment as void.

*Collins*, 141 S.Ct. at 1787 (emphasis in original).  Klapp emphasizes in his reply brief that he is not raising an Appointments Clause challenge.  (Doc. No. 18 at 5-6.)

Moreover, none of Klapp's complaints listed above describe the type of compensable harm stemming from an unconstitutional removal provision that was described in *Collins*.  Klapp does not state that when his application was pending the President was unable to remove Saul from office or believed

33

that he was unable to do so.  *Collins*, 141 S.Ct. at 1789.  Klapp does not describe how he was harmed at the time of the ALJ's decision in April 2020 or when the Appeals Council denied his request for review in October 2020.

In short, Klapp has not described compensable harm due to the unconstitutional removal provision in § 902(a)(3) under which Saul served as Social Security Commissioner.  His constitutional challenge fails.

## B.  Klapp's Listing Argument

In a vague and disjointed manner, Klapp asserts the ALJ erred by failing to consider the combination of impairments of Listings 1.02, 1.04, 3.02, 12.04, 12.06, and 12.15.  (Doc. No. 13 at 13-15.)[5]  In addition, Klapp asserts that the ALJ erred in evaluating Listings 12.04, 12.06, and 12.15, as he interprets the evidence as showing more than moderate limitations in each of the "B" criteria.  (*Id.* at 15-16.)  Klapp maintains "[t]he ALJ failed to provide sufficient information so this Court can facilitate meaningful judicial review" and such failure was "harmful and reversible error."  (*Id.* at 16.)

The Commissioner argues substantial evidence supports the ALJ's determination that Klapp's impairments or combination of impairments did not meet or medically equal a listing.  (Doc. No. 17 at 19.)

---

[5] The Court notes Klapp's counsel is an experienced Social Security practitioner who regularly practices in this court.  The Court warns counsel against the continued practice of lumping various challenges to different steps of the sequential disability evaluation together.

First, Klapp's listing arguments are not well-taken, as counsel – who represented Klapp at the administrative level – argued to the ALJ that this was a Step Five case.  (Tr. 52-53, 83-84.)  With respect to Klapp's argument that the ALJ failed to consider the combination of his impairments, the ALJ specifically found that Klapp's impairments *or combination of impairments* did not meet or medically equal the listings.  (Tr. 19-23.)  The ALJ's decision demonstrates that the ALJ considered Klapp's combination of impairments as required.  (*Id.*)  "[T]he fact that each element of the record was discussed individually hardly suggests that the totality of the record was not considered, particularly in view of the fact that the ALJ specifically referred to 'a combination of impairments' in deciding that [the claimant] did not meet the 'listings.'"  *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).  *See also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 931 (6th Cir. 2007) ("Further, the ALJ's decision reflects a comprehensive examination of Despins' medical impairments and explicitly concludes that Despins 'did not have any impairment or impairments that significantly limited his ability to perform basic work related activities.  That the ALJ may have discussed Despins' impairments individually 'hardly suggests that the totality of the record was not considered.'") (quoting *Gooch*, 833 F.2d at 592)).

Turning to Klapp's argument regarding Listings 12.04, 12.06, and 12.15, the ALJ provided a thorough analysis of Klapp's mental impairments at Step Three, which included both positive and negative findings, and explained the reasoning for his findings for each of the "paragraph B" criteria.  (Tr. 20-23.)  At bottom, Klapp's argument is nothing more than a request for this Court to reweigh the evidence, which it cannot do.  While Klapp interprets the records differently, the findings of the ALJ "are

35

not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  There is no error.

## C.  Klapp's Medical Opinion Arguments

Klapp asserts the ALJ erred in evaluating the opinion from Klapp's therapist, Crystal Mann, as well as the functional capacity evaluation done in 2020.  (Doc. No. 13 at 17-21.)  Regarding Mann's opinion, Klapp argues that the ALJ's "discounting" of the opinion as lacking "any rationale or support was contrary to the extensive counseling notes in the record."  (*Id.* at 20.)  With respect to the functional capacity evaluation, Klapp argues "the ALJ failed to provide a coherent explanation as to why this evaluation was unpersuasive along with the fact that no contemporaneous evidence was cited." (*Id.* at 21.)

The Commissioner argues the ALJ properly evaluated the medical opinion evidence.  (Doc. No. 17 at 29-33.)  The Commissioner did not explicitly address the ALJ's analysis of the functional capacity evaluation.  (*Id.*)

Since Klapp's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

36

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 404.1520c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[6] (2) consistency;[7] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. § 404.1520c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case
> records containing many types of evidence from different sources, it is not

---

[6] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[7] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she]

38

considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1)).  A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

After an exhaustive discussion of the record evidence, the ALJ found as follows regarding the functional capacity evaluation and Mann's opinion:

> As discussed above, on February 24, 2020, the claimant attended a FCE, requested by him to his primary care practitioner, and presented to Timothy Verdouw, O.T.R./L., with complaint of pain in the midline low back with "sciatica" pain bilaterally, pain in the right hip, and difficulty using the left hand (Ex. 21F/3). Mr. Verdouw provided his narrative conclusions and summarized "Return to Work Abilities" that the claimant performed in the overall "light" physical demand capacity, per lifting and carrying between 11 pounds and 21 pounds and pushing 15-30 pounds; and that he is "presently able to work full time while taking into account his need to alternate sitting and standing as noted in this report" (Ex. 21F/4,5-6). Other than lifting, carrying, and pushing abilities, Mr. Verdouw rated work-related tolerances, stated to have been demonstrated by the claimant at the FCE, in the following specific abilities:
>
> - "frequent" tolerance for fine coordination and above-shoulder forward reaching;
>
> - "occasional" tolerance for bending, repetitive and sustained kneeling, squatting, standing, walking, simple grasping, and gross coordination; and
>
> - "avoid" tolerance for climbing ladders and stairs, firm grasping, crawling, and dynamic and static balancing.

39

The conclusions from the FCE are **unpersuasive** beyond the lifting and carrying capacity consistent with the ability to meet the strength demands of light exertion work. Despite stating that results of a musculoskeletal exam were included, Mr. Verdouw provided absolutely no data or clinical observations to support his conclusions, with the one exception being the specific lifting abilities observed. The comment about a need to alternate sitting and standing has no further explanation, whether as based on the claimant's own subjective report or as distilled from the "occasional" standing and walking tolerances as conclusions. The left hand was not identified specifically in the grasping, coordination, and fine manipulation abilities, and the claimant's testimony conveying no issues using the right hand raise a serious flaw in the clarity of this report for inability to do firm grasping and only occasional tolerance for simple grasping with which hand(s). The lack of a detailed report for the FCE is coupled with the claimant's presenting complaints for bilateral sciatica and pain in one of the hips, which are symptoms that he either expressly denied or did not report at the primary care follow-up just four days earlier and at a time when he rated his low back pain as "intermittent" in frequency and not severe enough to warrant pain medication or further attempt at physical therapy (Ex. 20F/7,10). Again, at that close medical visit with primary care, pain could not be reproduced on musculoskeletal examination. Thus, Mr. Verdouw's conclusions are largely unsubstantiated by actual clinical observations or detailed findings on musculoskeletal exam, and this rather poor supportability is only furthered by the high degree of inconsistency with the very closely occurring primary care follow-up visit.

Additionally, the longitudinal medical evidence from other medical sources is highly inconsistent with the occasional standing and walking abilities and with other significantly limited tolerances shown in the FCE conclusions. These include, but are not limited to, the mild degree of DDD shown on June 2019 x-rays of the thoracic and lumbar spine, the clinical findings on physical examinations including normal gait and full strength in the lower extremities, the improvement in pain with walking and on movements of the back clinically shown in the short courses of concurrent chiropractic treatment and physical therapy, the similar reports of improving and mild to moderate intensity of back pain with those treatments, the failure to use or to seek prescription pain medications for managing pain, the lack of further treatments sought for back pain other than massages in the mall, and the full mobility of the left hand

40

observed by the orthopedic hand specialist in November 2019. In short, except for the lifting and carrying abilities consistent with light work, the occupational therapist's conclusions from the one-time, albeit recent, FCE are largely inconsistent with the other substantial medical evidence of record.

As for the mental impairments, in concluding his March 2019 consultative psychological examination of the claimant, Dr. Bryan Krabbe offered a medical opinion at least relating to the latter three broad areas of mental functioning, with no more than a summary of subjective complaints and mostly adequate performance on tests for reasoning and memory abilities with "below average" performance on short-term memory recall (Ex. 6F/6-7). Dr. Krabbe offered his opinion that the described symptoms of depression and anxiety "could result in" increased worry and a corresponding decrease in attention and concentration abilities in a work setting, that "may compromise" his ability to respond appropriately to work pressures without increased emotional instability and withdrawal, and that may compromise his ability to respond to work pressures without increased likelihood of agitation. As to social interactional abilities, Dr. Krabbe only offered that the claimant functions within adequate limits of intellectual functioning to understand and respond to supervisory feedback and to relate adequately with coworkers.

To the permissible extent of interpreting Dr. Krabbe's opinion as offering the expected difficulties in work-related sustained concentration and persistence and adaptation abilities at a significant (more than mild) degree, I do find it to be **generally persuasive**. In those two aspects of work-related mental abilities, Dr. Krabbe provided thorough rationale through his clinical observations and some relevant subjective reports, including the observed difficulty performing serial mental subtractions that suggest some difficulty maintaining attention and focus, being prescribed "psychoactive" medication through his primary care practitioner at that time, and endorsing some history of problems attending and completing tasks in a timely and effective manner at past jobs and of emotional deterioration in response to work pressure. However, he also offered essentially counterbalancing factors that would not suggest serious or marked degree of expected difficulties, including observations for no difficulty reciting backwards digit span at an average level (four) for gauging attention and concentration, no displayed distractibility, showing adequate task persistence when answering questions, and displaying appropriate responses and affect when discussing past

41

and current pressures. In addition to strong supportability, these aspects of his opinion are reasonably consistent with the collateral medical evidence from the claimant's own medical sources, including the subsequent 2019-early 2020 counseling notes and psychiatric progress notes that show some instances of manic behavior with moderately reduced concentration and attention, but other times normal findings (see, e.g., Ex. 8F/8-9; cf. Ex. 14F/42).

While Dr. Krabbe's opinion about social interactional abilities was certainly considered in light of his stated support in interacting appropriately and pleasantly during the evaluation and describing no significant problems in responding appropriately to supervision and to coworkers in past jobs, the inherent opinion for no limitations in that other area of mental functioning is less persuasive because it is not consistent with the other medical evidence in the record, and because it did not account for his other observations for anxiety in mood and facial affect or for the claimant's report of having minimal social contact beyond his wife and two children.

* * *

On January 9, 2020, the claimant's counselor, Crystal Mann, responded to a form-based medical opinion and offered that the symptoms associated with diagnoses of posttraumatic stress disorder and bipolar I disorder would cause reduced abilities to perform the following work tasks within the following ranges of "noticeable difficulty (distracted from job activity)" (Ex. 19F/2-4):

- having difficulty for 11-20% of the workday or workweek in working in coordination or proximity to others without being distracted, interacting appropriately with the public, getting along with coworkers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, being aware of normal hazards, and setting realistic goals or making plans independently of others;

- having difficulty for more than 20% of the workday or workweek in maintaining attention and concentration for extended periods, performing activities within a schedule, accepting instructions and responding appropriately to criticism from supervisors, responding appropriately to

42

changes in the work setting, and traveling in unfamiliar places or using public transportation; and

- <u>unable to</u> complete a normal workday and workweek due to psychological symptoms and to perform activities at a consistent pace without unreasonable number and length of rest periods.

In conjunction with the last limitation, Ms. Mann stated that the claimant would be off task for over 20% of the workday as a result of psychological symptoms and would need more than four unscheduled rest breaks per day for 30-45 minutes. Still, she rated no significant limitations in the abilities to understand, remember, and carry out very short and simple instructions, to make simple work-related decisions, and to sustain an ordinary routine without special supervision.

Ms. Mann's opinion is **unpersuasive** primarily because it has no rationale or support beyond a rote citation to the claimant's diagnoses and "associated symptoms" (Ex. 19F/4), but also because it offers greater degree of limitations than would be reasonably supported by her own counseling notes, and because it is inconsistent with the collateral medical evidence from the claimant's psychiatrist and from primary care practitioners as well as from the examining psychologist. The lack of any rationale seriously weakness the persuasiveness of this opinion for many seriously limited work-related mental abilities combined with significant off-task behavior and need for unscheduled rest breaks, and the treatment notes do not supply direct support for those limitations. Dr. Krabbe's examination documented mostly intact attention and concentration abilities at a period of early treatment for psychological symptoms, which also shows that the opinion is inconsistent with the most detailed examination done by any mental health professional in the record.

(Tr. 35-39.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions.  20 C.F.R. § 404.1520c(a).  With respect to the FCE, the ALJ found the opinion inconsistent with, and not supported by, medical evidence in the record, citing specific

evidence in support.  (*Id.* at 35-36.)   Klapp is mistaken in asserting the ALJ did not cite to contemporaneous evidence in discounting the findings included in the FCE.  The ALJ identified a primary care visit four days before the FCE where Klapp described his back pain as intermittent and not bad enough to take anything for it.  (*Id.* at 36, 821.)  At that visit, CNP Wilkins found normal range of motion and normal gait, and was unable to reproduce any pain on examination.  (*Id.* at 821.)

With respect to Mann's opinion, as the ALJ noted, the opinion lacked any in support of the limitations contained therein beyond listing Klapp's diagnoses and referring to "associated symptoms." (Tr. 38-39, 810-12).  While Klapp points to the evidence in support, Mann did not do so.  *See Price v. Comm'r of Soc. Sec. Admin.*, 342 F. App'x 172, 176 (6th Cir. 2009) ("Because Dr. Ashbaugh failed to identify objective medical findings to support his opinion regarding Price's impairments, the ALJ did not err in discounting his opinion.") (citations omitted).  *See also Buxton*, 246 F.3d at 773 ("[T]he ALJ 'is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.'") (citation omitted).  In addition, the ALJ considered Mann's treatment notes and found them inconsistent with her opinion.  It is the ALJ's job to weight the evidence and resolve conflicts, and he did so here.  While Klapp would weigh the evidence differently, it is not for the Court to do so on appeal.

**D.  Klapp's RFC and Credibility Arguments**

Klapp argues that the ALJ erred in relying on his daily activities in determining he had the residual functional capacity for light work, and that the ALJ cherry-picked the record in the subjective symptom

44

analysis by failing to mention the evidence which Klapp maintains supports his symptoms.  (Doc. No. 13 at 15, 23-24.)  The Commissioner argues the ALJ properly evaluated Klapp's subjective symptoms.  (Doc. No. 17 at 25-29.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the

45

adjudicator must explain why the opinion was not adopted.")).   While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at

46

*4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[8] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[9] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The

[8] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the March 18, 2020 hearing.
[9] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

47

ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health & Human Servs*., 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  *See* 20 C.F.R. §416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016).  Beyond medical evidence, there are seven factors that the ALJ should consider.[10]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

---

[10] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec*., 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

Here, the ALJ acknowledged Klapp's testimony and other statements regarding his symptoms and limitations.  (Tr. 23-25.)  The ALJ determined Klapp's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (*Id.* at 25.)  However, the ALJ found his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*)  Specifically, the ALJ found as follows:

> ### COPD
>
> * * *
>
> Considering the indeterminate medical cause of the shortness of breath and intermittent chest pressure, and while still finding these attributable to the symptom-based diagnosis of COPD by Dr. Rapaka, I find the lack of objective medical abnormalities on either diagnostic testing or on physical exanimations combines with other factors in the medical evidence as not fully consistent with any significant limitations in the ability to walk for extended durations or long distances. First, Mr. Klapp has refused to take any daily inhaler, per the June 2019 pulmonology follow-up note, and has thus relied on albuterol as necessary along with prescribed medications for managing anxiety to treat the breathing symptoms (Ex. 11F/4). Consistent with this, at the hearing, Mr. Klapp could not identify any inhaler other than the "rescue" (albuterol) and confessed he did not know what a nebulizer is. Second, but in addition to the lack of any remarkable treatment directed at these symptoms, Mr. Klapp described the shortness of breath to the cardiologist as occurring on "mild-to-moderate" exertion and with example of going up and down steps only, and did not apparently report similar symptom occurring at rest except when showering (Ex. 15F/1-2).
>
> Based on all the foregoing evidence, I am willing to find the pulmonologist's diagnosis of COPD most reasonably attributable to the claimant's alleged breathing difficulties and periodic chest pressure, but cannot find those symptoms as intense, persistent, and limiting of functional abilities to the extent

49

asserted in written reports and testimony. The COPD-attributable symptoms would prevent him from climbing ramps and stairs more than occasionally in a workday, and would preclude any climbing of ladders or ropes or scaffolding, but would not significantly limit his ability to walk for continuous periods and up to six hours of an eight-hour workday, especially when considering the rejection of treatment other than the rescue inhaler, and would not appear to become symptomatic with reduced exertion for lifting, carrying, pushing, or pulling light objects that weigh 10 to 20 pounds. While these symptoms would further warrant a need to avoid concentrated level of exposure to humidity, to temperature extremes (heat or cold), and to pulmonary irritants including dust and fumes and odors, the medical evidence simply does not support any additional limitations in physical or other work- related abilities.

### DDD of the Thoracic and Lumbar Spine

* * *

Thus, while he might not have had further insurance coverage to continue chiropractic treatment or physical therapy, the medical evidence is not consistent with the testimony that he immediately lost benefit of the treatments 30 minutes after each treatment session. No medical evidence supports his testimony that he has extended beyond these conservative treatment measures, such as injections to the back that he endorsed having received at the hearing.

* * *

Overall, the objective medical evidence, the very conservative courses of continuous treatment through over-the-counter remedies and massages, the limited but not as unsuccessful as alleged concurrent courses of formal physical therapy exercises and chiropractic manipulation and related treatments over July 2019-early September 2019, and the claimant's own statements about the intensity, location(s), and persistence/frequency of pain in the back or upper leg are largely inconsistent with the testimony, even in relation to the period since June 2019 when he has presented with such complaint to his own medical sources. The medical evidence discussed above fails to support any significant limitations caused by the pain attributable to mild DDD of the thoracic and lumbar spine in the claimant's abilities to sit, stand, or walk each for continuous

50

periods between typically scheduled rest breaks (i.e., about once every two hours) and each for about six total hours of an eight-hour workday. The foregoing analysis also fails to support the testimony that the 15-20 pounds of estimated lifting capacity truly reflect only maximum, one-time abilities but rather support that he could lift, carry, push, and/or pull 10 pounds on a frequent basis and no more than 20 pounds occasionally over an eight-hour workday, consistent with light exertion work. Finally, the musculoskeletal disorder of the thoracolumbar spine would prevent any safe climbing of ladders, ropes, or scaffolds, would combine with the COPD-related symptoms to prevent more than occasional climbing of ramps and stairs, but would not prevent frequent bending (both stooping and crouching), kneeling, and crawling over a workday.

### *Trigger Fingers of the Dominant Left Hand*

* * *

Despite the reportedly ongoing issues with the two trigger fingers over the several months after the injections, Mr. Klapp was still able to lift, carry, and push light weights at the February 24, 2020 FCE (Ex. 21F/4). January 29, 2020 x-rays of the left hand revealed no bony or arthritic abnormality (Ex. 20F/14).

Based on the limited medical evidence and altogether recent onset of trigger fingers affecting two digits of the left hand, I find that the medical evidence is only partially consistent with the stated symptoms and inability to maintain grasp for holding onto objects, but does support a limitation to frequent handling and frequent fingering abilities with the dominant left upper extremity. The trigger fingers on the one hand do not further limit his abilities to lift, carry, push, and pull light objects.

### *Mental Impairments*

* * *

In summary, the medical evidence does support some moderately significant limitations in his abilities to meet the mental demands of work activity, caused by the symptoms of diagnoses of GAD, bipolar disorder, and PTSD. However, the fluctuation in symptoms alone does not suggest any serious degree of limited abilities to maintain sufficient concentration, persistence, and pace for

completing work tasks; to interact with others; or to respond appropriately to changes and other stresses of work tasks. Key factors from the foregoing analysis that support this conclusion are the claimant's reported benefit from a past antidepressant, Zoloft, that he unfortunately had to discontinue due to side effects, and from his current antidepressant, Effexor; and the clinical observations made by his own medical sources and by Dr. Krabbe during the March 2019 consultative examination, with that occurring at a relatively early point in the course of treatment. I find that, despite the ongoing symptoms of depression and bipolar disorder and of anxiety attributed to diagnoses of GAD and PTSD, the claimant does have the residual mental abilities to tolerate the stresses and pressures of simple, routine tasks and of making only simple work-related decisions, and of few changes that would occur in a routine work setting; to sustain sufficient concentration, to persist at until completing, and to maintain adequate pace for performing simple, routine tasks; and to interact appropriately when having only occasional interactions with supervisors, with coworkers, and/or with members of the public.

***Other Evidentiary Factors (SSR 16-3p)***

* * *

In terms of his daily activities, Mr. Klapp stated in his written responses to the Function Report that he very rarely goes outside in periods of colder weather due to the breathing symptoms, does not shop due to limited walking ability and need to sit periodically, does not socialize with others beyond his wife and two children, and no longer hikes or engages in exercise or other hobbies but rather spends most of a typical day watching television (Ex. 3E/2-5). Offering similar account in testimony of his daily functioning, Mr. Klapp stated that he becomes severely winded and experiences chest pressure halfway through a shower. He testified that his wife still does the grocery shopping and that he goes weeks at a time without leaving the house.

Although the claimant has described daily activities that are fairly limited, two general factors weigh against considering these allegations to be strong evidence in favor of the argued inability to meet the demands of light work or more than sedentary work on a sustained basis. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.

52

Second, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to his medical conditions, as opposed to other reasons, in view of the foregoing discussion of the medical evidence. Overall, the claimant's reported limited daily activities are considered outweighed by the other factors discussed above.

More specifically, in addition to endorsing some intact abilities for preparing simple meals for himself daily, emptying the dishwasher, attending regularly to all personal grooming and self- care tasks (despite infrequently leaving the home), cutting the grass weekly (when seasonally appropriate) on a riding-type lawnmower, and visiting a friend once or twice a month, Mr. Klapp has described to his own medical sources over the year 2019 a number of additional activities.

These activities include riding a motorcycle, going on walks outside, going on a vacation "on a cruise ship" despite professing severe social anxiety and depression-related avoidance of contact with others, lifting "heavy objects" later clarified to be a box of shingles despite back pain, and several occasions of getting together with one or more friends (see Ex. 6F/4; 10F/56; 18F/41; 11F/1; 14F/4; 13F/1; 14F/24,32). As such, the claimant has described activities to his medical sources that are inconsistent with the asserted level of inactivity in his written reports and testimony and, in general, are not limited to the extent of alleged intensity and persistence, despite treatment, of chronic pain, breathing difficulties, social isolation from psychological symptoms, and other symptoms. While none of these activities, considered in isolation, would warrant a finding of any greater physical or other work-related abilities than supported by the preceding analysis of the medical evidence, considering them in the aggregate and in appropriate context and combination with those medical factors does lend further evidentiary support to my conclusion that the claimant would be capable of engaging in sustained work activity within the parameters of such residual functional capacity.

Based on the foregoing analysis, I conclude that the claimant's statements about the intensity, persistence, and functionally limiting effects of back pain, trigger fingers on his dominant hand, breathing and related symptoms, and psychological symptoms are only partially consistent with the medical evidence and other evidence in the record, to the extent reflected in this Finding of

> residual functional capacity for a range of light work. Neither the objective
> medical evidence nor any of the other relevant evidentiary factors in the record
> discussed above support the argued inability to sustain performance of more
> than primarily seated ("sedentary") work activity, whether by reduced
> lifting/carrying to 10 pounds occasionally and less than such weight frequently
> or by inability to stand or walk for more than two total hours of an eight-hour
> workday; or a further restriction to occasional handling and fingering with the
> dominant left upper extremity; or a need to alternate between standing and
> sitting positions at a frequency beyond what could readily be accommodated by
> scheduled rest periods.

(Tr. 25-34) (emphasis in original).

The Court finds substantial evidence supports the ALJ's assessment of Klapp's subjective complaints.  The record evidence, as noted by the ALJ, is not entirely consistent with Klapp's allegations of disabling conditions.  (*Id.* at 25-34.)  Contrary to Klapp's allegations, the ALJ credited some of Klapp's subjective symptoms but did not accept them to the extent alleged by Klapp because of findings on examinations and his daily activities, factors to be considered under the regulations.  (*Id.*)  An ALJ can consider a claimant's activities of daily living when assessing symptoms.  *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) ("Although the ability to do household chores is not direct evidence of an ability to do gainful work, see 20 C.F.R. § 404.1572, '[a]n ALJ may...consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.'") (internal citations omitted)).  In addition to resolving conflicts in the medical evidence, the ALJ used Klapp's activities of daily living to partially discount his testimony regarding the level of severity of his symptoms.

*See Phillips v. Comm's of Social Sec.*, No. 5:20 CV 126, 2021 WL 252542, at *10 (N.D. Ohio Jan. 26, 2021).  Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability.  (*Id.*)

### VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date:  February 2, 2022                           *s/ Jonathan Greenberg*
                                                  Jonathan D. Greenberg
                                                  United States Magistrate Judge

55